UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

POWER DENSITY SOLUTIONS, LLC,

Plaintiff,

v.

GOOGLE LLC,

Defendant.

Case No.:  24-cv-2122-RSH-JLB

**CLAIM CONSTRUCTION ORDER**

Plaintiff Power Density Solutions, LLC ("Power Density") alleges defendant Google LLC ("Google") infringes U.S. Patent No. 6,552,901 ("the '901 Patent"). The Parties have submitted two disputed terms for construction. The Court held a claim construction hearing on August 14, 2025. Having considered the Parties' briefing and oral arguments, the Court construes the disputed claims as follows.

I.    **BACKGROUND**

  A.    **Generally**

Plaintiff is a California limited liability company. ECF No. 1 ("Compl.") ¶ 2. Plaintiff owns, by assignment, the '901 Patent. *Id.* On November 12, 2024, Plaintiff brought the instant action against defendant Google, alleging the cooling system used in

version 3 of Google's Tensor Processing Units infringes independent Claims 1 and 16, and dependent Claims 17-19, of the '901 Patent. *Id.* ¶¶ 8, 10; ECF Nos. 1-3; 34 at 11.

On May 19, 2025, in accordance with the Patent Local Rules, the Parties filed their Joint Claim Construction Hearing Statement, Chart, and Worksheet. ECF No. 27. On June 30, 2025, the Parties filed their Opening Claim Construction Briefs. ECF Nos. 34, 35. On July 18, 2025, the Parties field their Responsive Claim Construction Briefs. ECF Nos. 36, 37.

### B.    The Asserted Patent

The '901 Patent is entitled: "Apparatus and System for Cooling Electronic Circuitry, Heat Sinks, and Related Components." The patent "relates generally to the cooling of electronic circuitry, integrated circuit boards, heat sinks, and power electronic components to increase their power density." '901 Patent, col. 1:15–17.

As background, the '901 Patent explains that the performance of most electronic devices is constrained by thermal limitations. *Id.* at col. 1:15–25. These limitations "have a direct effect on efficiency, power density, packaging and the architectural configuration for these components in their operating environment." *Id.* at col. 1:23–25. Prior art methods of cooling components on an integrated circuit board have included: (1) "traditional spray-cooling designs," whereby a coolant is directed towards these components; (2) placing a "cooling body" in contact with the electronic device; and (3) filling a "liquid cooled circuit package" during operation. *Id.* at cols. 2:4–31; 3:4–18.  According to the '901 Patent, these prior art systems exhibited certain inefficiencies. For example, in a traditional spray-cooling system, inefficiencies result from evaporated vapors having to escape in the direction of the coolant vapors being sprayed. *Id.* at col. 3:8–11.

The invention of the '901 Patent purports to teach a more effective system and method of removing latent heat from electronic components. *Id.* at col. 1:45–49. To do so, the '901 Patent describes a system and method for supplying a cooling fluid capable of phase change to "passageways within an integrated circuit board and/or its components and/or heat sinks." *Id.* at col. 2:61–63; *see also* Abstract. The cooling fluid "passes through

the passageways and exits through ports or nozzles on the surface of the integrated circuit board, components or heat sink." *Id.* at col. 2:63–65. The components of the circuit board may therefore be cooled "by both conductive cooling as the fluid passes through the core of the component, circuit board, or heat sink and by evaporative cooling as the liquid changes phase at or near the surface of the component circuit board, or heat sink." *Id.* at cols. 2:66–3:3; *see also id.* at Abstract.

## II.    LEGAL STANDARD

### A.    Claim Construction Generally

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.,* 381 F.3d 1111, 1115 (Fed. Cir. 2004)).

A determination of infringement therefore "involves a two-step analysis. 'First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process.'" *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1320 (Fed. Cir. 2003) (quoting *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993)).

The first step, commonly known as claim construction, is presently before the Court. The Court construes patent claims ultimately as a matter of law, although "subsidiary factfinding is sometimes necessary." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 326 (2015); *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388 (1996) ("[J]udges, not juries, are the better suited to find the acquired meaning of patent terms."). "Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)). Accordingly, a claim should be construed in a manner that "stays true to the claim language and most naturally aligns with the patent's description of the invention[.]" *Id.*

"In determining the proper construction of a claim, the court has numerous sources that it may properly utilize for guidance." *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). These sources "include both intrinsic evidence (*e.g.,* the patent specification and file history) and extrinsic evidence (*e.g.,* expert testimony)." *Id.* It is well-settled that in construing an asserted claim, a court "look[s] first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Id.* (citation omitted); *see also Vederi, LLC v. Google, Inc.*, 744 F.3d 1376, 1382 (Fed. Cir. 2014) ("In construing claims, this court relies primarily on the claim language, the specification, and the prosecution history.").

The claim construction inquiry "begins and ends in all cases with the actual words of the claim." *Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*, 365 F.3d 1299, 1303 (Fed. Cir. 2004) (internal quotations omitted); *see also Vitronics,* 90 F.3d at 1582 ("[W]e look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention."). The words of a claim should generally be "given their ordinary and customary meaning." *Vitronics*, 90 F.3d at 1582. "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art ["POSITA"] in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. "However, in many cases, the meaning of a claim term as understood by persons of skill in the art is not readily apparent." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).

"[S]econd, it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *Vitronics*, 90 F.3d at 1582. "The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines them by implication." *Id.* "Usually, [the

specification] is dispositive; it is the single best guide to the meaning of a disputed term." *Id.*

"Third, the court may also consider the prosecution history of the patent, if in evidence." *Id.* The prosecution history consists of the "complete record of all proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims." *Id.* "[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317. "Nonetheless, the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

"In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term." *Vitronics*, 90 F.3d at 1583. A court is also authorized, however, to consider extrinsic evidence in construing claims, such as "expert and inventor testimony, dictionaries, and learned treatises." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370. Although a court may consider evidence extrinsic to the patent and prosecution history, such evidence is considered "less significant than the intrinsic record" and "less reliable than the patent and its prosecution history in determining how to read claim terms[.]" *Phillips*, 415 F.3d at 1317–18 (internal quotation marks and citations omitted); *see also Biagro W. Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1302 (Fed. Cir. 2005) ("Extrinsic evidence, such as expert testimony, may be useful in claim construction, but it should be considered in the context of the intrinsic evidence.").

Extrinsic evidence may not be "used to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Phillips*, 415 F.3d at 1324. In cases where it is necessary for a court to consult extrinsic evidence "in order to understand, for example,

the background science or the meaning of a term in the relevant art during the relevant time period," and such subsidiary facts "are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence." *Teva*, 574 U.S. at 331–32.

## B.    Means-Plus-Function Claims, 35 U.S.C. § 112, ¶ 6

Under 35 U.S.C. § 112, ¶ 6:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6 (pre-AIA).[1]

"Section 112 ¶ 6 offers patent applicants two options: (1) recite, in the claim, a function without reciting structure for performing the function and limit the claims to the structure, materials, or acts disclosed in the specification (or their equivalents), in which case § 112 ¶ 6 applies, or (2) recite both a function and the structure for performing that function in the claim, in which case § 112 ¶ 6 is inapplicable." *Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1365 (Fed. Cir. 2022). "Limitations that invoke § 112 ¶ 6 are generally known as 'means-plus-function' [claims]." *Id.* The statutory provision "represents a *quid pro quo* by permitting inventors to use a generic means expression for a claim limitation *provided that* the specification indicates what structure(s) constitute(s) the means." *Atmel Corp. v. Info. Storage Devices*, 198 F.3d 1374, 1381 (Fed. Cir. 1999).

## C.    Indefiniteness

A patent must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as [the] invention." 35

---

[1]    35 U.S.C. § 112 was amended by the America Invents Act ("AIA"), which took effect on September 16, 2012. *Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1379 n.8 (Fed. Cir. 2022). As the application resulting in the '901 Patent was filed before September 16, 2012, this opinion refers to the pre-AIA version of § 112.

U.S.C. § 112, ¶ 2 (pre-AIA).  A claim fails to satisfy this statutory requirement and is thus invalid for indefiniteness if its language, when read in light of the specification and the prosecution history, "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). Indefiniteness is a "question of law that may contain underlying facts." *Berkheimer v. HP Inc.*, 890 F.3d 1369, 1370 (Fed. Cir. 2018). "[A] party challenging patent validity on indefiniteness grounds carries the burden of proof." *Bosch Auto. Serv. Sols., LLC v. Matal*, 878 F.3d 1027, 1040 (Fed. Cir. 2017).

"Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017). "[A] claim is not indefinite merely because it poses a difficult issue of claim construction; if the claim is subject to construction, i.e., it is not insolubly ambiguous, it is not invalid for indefiniteness." *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1372 (Fed. Cir. 2004). "That is, if the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds." *Id.* (internal quotation marks omitted).

## III.    ANALYSIS

### A.    Agreed Upon Constructions

The Parties have agreed upon the following constructions:

| Limitation | Agreed Construction |
|---|---|
| "means for supplying cooling fluid capable of phase change to said interior passageway" (Claims 1 and 16) | Construed as a means-plus-function term under 35 U.S.C. § 112, ¶ 6<br><br>Function: supplying cooling fluid capable of phase change to said interior passageway<br><br>Structure: pump in combination with a manifold or supply line |

7

| | Alternate Structure: the evaporator side of a heat pipe and a reservoir of cooling fluid having a heat differential between them |
|---|---|
| "means for collecting and recycling said cooling fluid" (Claims 1 and 16") | Construed as a means-plus-function term under 35 U.S.C. § 112, ¶ 6<br><br>Function: collecting and recycling said cooling fluid<br><br>Structure: environmental housing with a manifold, a radiator, an intercooler, a compressor, a filter, a pump, and/or a regulator |
| "standard size slot in a standard case for containing electronic components" (Claim 18) | Plain and ordinary meaning |
| "exterior surface of said heat sink" (Claims 1 and 16) | Plain and ordinary meaning |

The Court adopts the Parties' agreed upon constructions for these terms. *See MyMail, Ltd. v. Am. Online, Inc.,* 476 F.3d 1372, 1378 (Fed. Cir. 2007).

## B.    Disputed Constructions

### 1.    *"means for adjusting the rate at which said cooling fluid passes through said interior passageway […] so that substantially no cooling fluid is vaporized within said interior passageway" (Claims 1 and 16)*

The term "means for adjusting the rate at which said cooling fluid passes through said interior passageway so that substantially no cooling fluid is vaporized within said interior passageway" appears in Claims 1 and 16 of the '901 Patent.

Claim 1 of the '901 Patent recites:

1. A method for cooling a heat sink comprising:

providing a heat sink with at least one interior passageway within said heat sink and at least one secondary passageway in fluid communication with said at least one interior passageway connecting said interior passageway to an exterior surface of said heat sink;

8

providing means for supplying cooling fluid capable of phase change to said interior passageway;

providing *means for adjusting the rate at which said cooling fluid passes through said interior passageway;*

*adjusting the rate at which said cooling fluid passes through said interior passageway so that substantially no cooling fluid is vaporized within said interior passageway*; and

providing means for collecting and recycling said cooling fluid.

'901 Patent, Claim 1 (emphasis added).

Claim 16 of the '901 Patent recites:

1. A system for cooling an electronic component comprising:

at least one electronic component;

a heat sink attached to said at least one electronic component;

said heat sink having at least one interior passageway within said heat sink and at least one secondary passageway in fluid communication with said at least one interior passageway connecting said interior passageway to an exterior surface of said heat sink;

means for supplying cooling fluid capable of phase change to said interior passageway;

*means for adjusting the rate at which said cooling fluid passes through said interior passageway so that substantially no cooling fluid is vaporized within said interior passageway*; and

means for collecting and recycling said cooling fluid.

*Id.*, Claim 16 (emphasis added).

The Parties agree the "means for adjusting the rate at which said cooling fluid passes through said interior passageway so that substantially no cooling fluid is vaporized within said interior passageway" is a means-plus-function term under 35 U.S.C. § 112, ¶ 6 (pre-AIA). ECF No. 27-1 at 2. The Parties also agree the term's function is "adjusting the rate

at which said cooling fluid passes through said interior passageway [so that substantially no cooling fluid is vaporized within said interior passageway].” *Id.* The Parties dispute, however, whether the '901 Patent discloses an adequate structure that is clearly linked to this function.

### a.    *Clearly Linked*

Google first contends the “means for adjusting” term is indefinite because the '901 Patent specification fails to clearly link any structure to the recited function of “adjusting the rate at which said cooling fluid passes through said interior passageway so that substantially no cooling fluid is vaporized within said interior passageway.” ECF No. 35 at 8. Plaintiff responds that the patent specification clearly links the “manifold(s), pump(s), tube sizing and the evaporator side of a heat pipe and a reservoir of cooling fluid having a heat differential between them” as the corresponding structure for this term. ECF Nos. 34 at 17–20; 36 at 3–8.

“A structure disclosed in the specification is corresponding structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.” *Chi. Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1367 (Fed. Cir. 2012) (internal quotation marks omitted). “While the specification must contain structure linked to claimed means, this is not a high bar[.]” *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007). For a patent to satisfy this standard, a POSITA must be able “to recognize the structure in the specification and associate it with the corresponding function in the claim[.]” *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1352 (Fed. Cir. 2015); *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376 (Fed. Cir. 2001) (“Whether or not the specification adequately sets forth structure corresponding to the claimed function necessitates consideration of that disclosure from the viewpoint of one skilled in the art.”). As such, “a challenge to a claim containing a means-plus-function limitation as lacking structural support requires a finding, by clear and convincing evidence, that the specification lacks disclosure of

structure sufficient to be understood by one skilled in the art as being adequate to perform the recited function." *Budde*, 250 F.3d at 1376–77.

The Court "first examine[s] the specification for a clear link or association." *Medtronic, Inc. v. Advanced Cardiovascular Sys.*, 248 F.3d 1303, 1312 (Fed. Cir. 2001). Here, the '901 Patent specification does not explicitly recite the phrase "adjusting the rate at which said cooling fluid passes through said interior passageway."

The '901 Patent does, however, disclose supplying cooling fluid under pressure to a manifold that is "adapted to supply cooling fluid." *See* '901 Patent, cols. 3:55–57 ("[S]uch components may be individually mounted to a manifold adapted to supply cooling fluid to the components."); 3:62–63 ("Cooling fluid may be supplied to the heat sink by way of a manifold[.]"); 5:53–54 ("Cooling fluid is provided under pressure to manifold 14."); 6:65–66 ("Cooling fluid is provided under pressure to manifold 100 by supply line 102."); 8:47–48 ("Cooling fluid is supplied under pressure to chamber 200 by supply line 206."); 9:11-13 ("Cooling fluid may be supplied under pressure to the interior of heat sink 254 via supply line 256.").

Two methods for pressurizing cooling fluid are described in the specification. The first uses a pump. *Id.* at cols. 5:54–55 ("The fluid may be pressurized by a pump or other conventional means."); 6:66–67 ("The fluid may be pressurized by a pump or other conventional means."); 8:48–49 ("The fluid may be pressurized by a pump, temperature differentiation, or other conventional means."). The second is through the temperature difference between the evaporator side of a heat pipe and a reservoir of cooling liquid. *See id.* at cols. 5:57–62 ("[T]he cooling fluid is pressurized by the heat differential between the evaporator side of the heat pipe (i.e. the manifold 14, heat sink 12 and circuit board 10) and the reservoir of cooling fluid (not shown) that supplies the cooling fluid to manifold 14."); 7:2–5 ("[T]he cooling fluid is pressurized by the heat differential between the evaporator side of the heat pipe (i.e. the manifold 100) and the reservoir of cooling fluid (not shown) that supplies the cooling fluid to manifold 100."); 8:52–57 ("[T]he cooling fluid is pressurized by the heat differential between the evaporator side of

the heat pipe (i.e. chamber 200, circuit board or die 202, coils 206, and heat sink 204) and the condenser or reservoir of cooling fluid (not shown) that supplies the cooling fluid to chamber 200.").

The '901 Patent specification therefore identifies: (1) a pump; and (2) a heat pipe and reservoir of cooling liquid as devices capable of pressurizing cooling liquid. Plaintiff contends that a POSITA would have understood that the same structures that pressurize cooling fluid would also "adjust[] the rate at which said cooling fluid passes through said interior passageway so that substantially no cooling fluid is vaporized within said interior passageway." ECF Nos. 34 at 19 ("[A] POSITA will clearly understand that the flow rate is changed by pressurization and the pump serves this purpose and is a structure to prevent vaporization in the fluid system."); 36 at 4 ("[A] POSITA would understand that the pressure of the cooling liquid dictates its rate of flow within a given system."). In support, Plaintiff cites the opinions of its expert, Dr. Banerjee. ECF No. 34 at 19. Google responds Dr. Banerjee's testimony is not, by itself, sufficient to clearly link these structures to the function of "adjusting the rate at which said cooling fluid passes through said interior passageway so that substantially no cooling fluid is vaporized within said interior passageway." ECF No. 35 at 9.[2]

In the context of a means-plus-function claim under 35 U.S.C. § 112, ¶ 6, it is well-established that "[t]here must be structure in the specification." *Atmel Corp. v. Info. Storage Devices*, 198 F.3d 1374, 1382 (Fed. Cir. 1999). Nevertheless, "[t]his conclusion is not inconsistent with the fact that the knowledge of one skilled in the particular art may be used to understand what structure(s) the specification discloses, or that even a dictionary or other

---

[2]    The Parties also contested at the claim construction hearing as to whether Dr. Banerjee applied the correct legal standard in forming his opinions on indefiniteness. Reading Dr. Banerjee's declaration and deposition testimony as a whole, the Court finds Dr. Banerjee's opinions support that a POSITA would understand there to be structures clearly linked to the "means for adjusting" limitation.

documentary source may be resorted to for such assistance, because such resources may only be employed in relation to structure that is disclosed in the specification." *Id.*

Here, Dr. Banerjee testified that a POSITA would have understood that: (1) a pump or a heat pipe can be used to adjust the pressure of cooling liquid being fed into an interior passageway; and (2) changing the pressure of a liquid changes its flow rate:

> A. So somebody who's skilled in the art knows that a pump can change the pressure of the inlet of a system and if the inlet pressure changes, the flow rate also changes. That's known to anybody skilled in the art.

ECF No. 34-5 at 65:3–7.

> Q. Is that—is a heat pipe a way to pressurize the coolant in the system?
>
> A. It is if you.
>
> Q. How does that work?
>
> A. If you take a heat—a heat pipe, you know, textbook, for example there are lots of textbooks on heat pipes, when you vaporize the fluid on one end of the heat pipe, that end is at a slightly marginally higher pressure than the end of the heat pipe where the vapor is condensing and so because of that pressure differential created by the temperature differential the vapor flows from the hot end of the heat pipe to the cold end of the heat pipe and so that's a—a structure for achieving pressurization in the system and creating a pressure differential that causes the fluid to flow.

*Id.* at 73:16–74:7; *see id.* at 64:8–16; 65:12–16; 65:23–25; 70:1–6; 70:24–71:9; 74:8–74:20; *see also* Banerjee Decl. at ¶ 22 ("The structures that support the regulation and adjustment of the flow can be . . . pressurization by a manifold and/or pump . . . and temperature differential . . . created by the evaporator side of a heat pipe and a reservoir of cooling fluid having a heat differential between them.").

In addition to Dr. Banerjee's opinions, Plaintiff also cites patents issued prior to the '901 Patent that discuss the availability of pumps in the marketplace and describe how the flow rate of a pump is related to liquid pressure. *See* ECF No. 34 at 20; U.S. Patent No.

5,719,444 at col. 6:59–61 ("The cooling condenser 33 and pump 35 of the cooling system are of conventional design and *available in the present day marketplace*[.]") (emphasis added); U.S. Patent No. 5,983,997 at 8:3–5 ("This graph demonstrates that the *flow rate of the pump is typically inversely proportional to the pressure*.") (emphasis added). Finally, Google's own expert, Dr. King testified that a pump is a device "that provides a given flow rate at a given pressure differential." ECF No. 34-4 at 24:9–11.

Taken together, the record suggests that a POSITA would have understood that: (1) a pump or a heat pipe can be used to change the pressure of a cooling fluid; and (2) that variations in pressure would affect the cooling liquid's flow rate. *See Telcordia Techs., Inc. v. Cisco Sys.*, 612 F.3d 1365, 1377 (Fed. Cir. 2010) (referring to expert testimony that circuitry in controller corresponded to "monitoring means"); *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1339 (Fed. Cir. 2008) (referring to expert testimony that technology to perform claimed function "was available at the relevant time and would have been known to a person skilled in the art").[3]

Google argues a pump is not "clearly linked" as a corresponding structure to the "means for adjusting" term because the '901 Patent does not set forth, in detail, how a POSITA would use a pump to adjust flow rate. This argument is not persuasive. "The law is clear that patent documents need not include subject matter that is known in the field of the invention and is in the prior art, for patents are written for persons experienced in the field of the invention." *S3 Inc. v. nVidia Corp.*, 259 F.3d 1364, 1371 (Fed. Cir. 2001). Instead, under Federal Circuit precedent, "knowledge of one skilled in the art can be called upon to flesh out a particular structural reference in the specification for the purpose of satisfying the statutory requirement of definiteness." *Creo Prods. v. Presstek, Inc.*, 305 F.3d 1337, 1347 (Fed. Cir. 2002) (collecting cases). Here, Plaintiff submitted evidence a

---

[3]    At the hearing, Plaintiff's counsel represented that Plaintiff was not relying on a "manifold" or "tube sizing" as structures independent of a pump or heat pipe for the "means for adjusting" limitation.

POSITA would understand how to modify the operational parameters of a pump to set different flow rates. Banerjee Decl. ¶ 23; ECF No. 34-5 at 115:4–24. Notably, Google does not submit clear and convincing evidence that a POSITA would *not* have understood how to do so.[4]

Google's argument the Federal Circuit's decision in *Medtronic* is "particularly on point" is also unpersuasive. ECF No. 35 at 10. In *Medtronic*, plaintiff alleged infringement of a patent directed to intravascular coronary stents. 248 F.3d at 1305. The independent claims of the patent recited a stent with "means for connecting adjacent elements together." *Id.* at 1308. It was undisputed one corresponding structure of the recited function of "connecting adjacent elements together" was the helical windings of a continuous wire. *Id.* at 1310. The question before the Court of Appeals was whether additional structures—a straight wire, wire hooks, and suture ties—were *also* clearly linked to the recited function. *Id.* at 1311. The Court of Appeals held that while these additional structures were "capable of performing the function recited in the means-plus-function limitation," there was "no clear link or association between the disclosed structures and the function recited in the means-plus-function claim limitation" as: (1) the patent specification described the stent *only* as a helically wound continuous-wire stent; and (2) the specification made clear the function of the straight wire, wire hooks, and suture ties was to perform a different function—"to prevent overstretch" and not "to connect adjacent elements of the helix together." *Id.* at 1312–13.

Here, Google has not sufficiently explained how the instant case is analogous to *Medtronic*, where "the patent specification disclosed multiple structures potentially capable of performing the recited function, but the specification expressly discussed and

---

[4]    Google advances a similar argument that the '901 Patent does not explain in detail how a heat pipe would be utilized to adjust flow rate. ECF No. 35 at 14. At the hearing, however, Google acknowledged that the patent discloses using a heat pipe to pressurize cooling liquid. And as noted above, Dr. Banerjee opined how pressurizing cooling liquid would adjust flow rate.

thus clearly linked only a subset of those structures to the recited function." *Freeman v. Gerber Prods. Co.*, 120 F. App'x 322, 326 (Fed. Cir. 2005). Google does *not*, for example, argue that some smaller subset of structures disclosed in the specification performs the recited "adjusting" function. In light of these differences, the Court is unpersuaded that *Medtronic* supports Google's indefiniteness argument.[5]

### b.    Capable of Performing the Function

Google next contends that a pump cannot be the corresponding structure clearly linked to the "means for adjusting" limitation, because a POSITA would have recognized that a pump, *by itself*, cannot "adjust the rate at which cooling fluid passes through an interior passageway so that substantially no cooling fluid is vaporized within said interior passageway." ECF No. 35 at 11–13.

In support, Google cites Dr. King's declaration, who opines that to "adjust the rate at which cooling fluid passes through an interior passageway" such that substantially no cooling fluid is vaporized within said interior passageway, the linked structure must include not only a pump, but also a feedback system with a sensor that monitors the amount of vaporization in the interior passageways. King Decl. ¶ 20 ("Put another way, a pump could not, alone, perform the features of the claimed function. At minimum, the structure would also need a sensor to measure the amount of vaporization in the interior passageways, as well as some type of feedback mechanism to transmit the sensor output back to the pump").

///
///
///
///

---

[5]    Google's reliance on the Federal Circuit's *Biomedino* decision is also unpersuasive. In *Biomedino,* the Federal Circuit found that a black-box figure in a patent specification labeled "Control," accompanied by a bare statement of known techniques, was insufficient to clearly link a structure to a recited function.  490 F.3d at 950–52. The instant case does not present this type of "black box" disclosure.

Plaintiff responds that Google's argument erroneously assumes that the '901 Patent discloses a system where the cooling liquid's flow rate is *constantly* being adjusted during operation:

> Google argues that the '901 Patent fails to disclose a feedback system and sensors to measure vaporization and tailor the flow rate accordingly. *This* [*erroneously*] *assumes that constant adjustment is required.* Dr. Banerjee explained that the operational parameters of a pump can be adjusted to a desired flow rate to avoid evaporation. In other words, a POSITA is capable of evaluating the conditions of their system—the size of the flow conduits, the cooling liquid used, the highest possible temperature of electronic components, etc.—and adjusting the pump parameters to set an appropriate flow rate to meet the goal of avoiding vaporization within the internal passageway. If conditions within the system change, the pump can be adjusted further.

ECF No. 36 at 7 (emphasis added) (internal citations omitted).

The Court agrees with Plaintiff. This is not what the Parties' agreed-upon construction for the recited function requires. *See GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1317 (Fed. Cir. 2014) (rejecting attempt to import an "extraneous adjectival modifier" into the claims). In light of Plaintiff's clarification that the "means for adjusting" limitation does not require the constant adjustment of flow rate, Google's argument is unpersuasive.

### c.    Court's Construction

For the above reasons, the Court rejects both Parties' proposed constructions. Google has not met its burden of demonstrating by clear and convincing evidence that the "means for adjusting the rate at which said cooling fluid passes through said interior passageway so that substantially no cooling fluid is vaporized within said interior passageway" term is indefinite.

The Court construes the term as follows: the claimed function is "adjusting the rate at which said cooling fluid passes through said interior passageway [so that substantially no cooling fluid is vaporized within said interior passageway]"; the corresponding structure

is a "pump, or the evaporator side of a heat pipe and a reservoir of cooling fluid having a heat differential between them."

### C. "substantially no cooling fluid is vaporized within said interior passageway" (Claims 1 and 16)

The term "substantially no cooling fluid is vaporized within said interior passageway" appears in the "means for adjusting" limitations in Claims 1 and 16 of the '901 Patent. Specifically, Claim 1 recites a "means for adjusting the rate at which said cooling fluid passes through said interior passageway . . . so that *substantially no cooling fluid is vaporized within said interior passageway*." '901 Patent, Claim 1 (emphasis added). Claim 16 recites a "means for adjusting the rate at which said cooling fluid passes through said interior passageway so that *substantially no cooling fluid is vaporized within said interior passageway.*" *Id.*, Claim 16 (emphasis added).

Plaintiff proposes the "substantially no cooling liquid" term be construed according to its plain and ordinary meaning. If a construction is instead required, Plaintiff proposes that the term be construed as "no or minimal [cooling fluid is lost]; no or minimal [vaporization]." ECF No. 27-1 at 4. Google contends that the term should be held indefinite because it is a term of degree without sufficient guidance as to its scope. ECF Nos. 35 at 16–18; 37 at 11–14.

Under Federal Circuit precedent, claims involving terms of degree are not inherently indefinite. *See Sonix Tech*, 844 F.3d at 1377 ("Because language is limited, we have rejected the proposition that claims involving terms of degree are inherently indefinite."); *see also Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014) ("We do not understand the Supreme Court to have implied . . . and we do not hold today, that terms of degree are inherently indefinite."); *see also Tinnus Enters., LLC v. Telebrands Corp.*, 733 F. App'x 1011, 1022 (Fed. Cir. 2018) ("[T]his court has repeatedly confirmed that relative terms such as 'substantially' do not render a patent claim per se indefinite."). "[A] patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement." *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374,

1384 (Fed. Cir. 2005) (internal quotation marks omitted). Instead, "[c]laim language employing terms of degree has long been found definite where it provided enough certainty to one of skill in the art when read in the context of the invention." *Interval*, 766 F.3d at 1370. "The claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art." *Id.* at 1371; *see Berkheimer v. HP Inc.*, 881 F.3d 1360, 1364 (Fed. Cir. 2018) ("Our case law is clear that the objective boundaries requirement applies to terms of degree."). The standard "mandates clarity, while recognizing that absolute precision is unattainable." *Nautilus,* 572 U.S. at 899.

The Court looks first to the language of the claims to determine whether the meaning of "substantially no cooling fluid is vaporized within said interior passageway" is reasonably clear. *See Berkheimer*, 881 F.3d at 1363. "The word 'substantially,' when used in a claim, can denote either language of approximation or language of magnitude." *Enzo Biochem, Inc. v. Applera Corp.,* 599 F.3d 1325, 1333 (Fed. Cir. 2010). Here, as used in the phrase "substantially no cooling fluid is vaporized within said interior passageway," the term "substantially" denotes magnitude because it purports to describe *how much* vaporization occurs. *See id.*

Google contends the indefiniteness of this limitations is "confirmed" when comparing independent Claim 1 with dependent Claim 2. ECF No. 37 at 11. Specifically, Google argues the limitation that "substantially no cooling fluid is vaporized within said interior passageway" is inconsistent with Claim 2's limitation that "at least some of said cooling fluid" is vaporized within the secondary passageway. *Id.* The Court does not agree. Claim 1 recites at least *two* different passageways: (1) an interior passageway "within" the heat sink; and (2) a secondary passageway that connects the interior passageway to the exterior surface of the heat sink. *See* '901 Patent, Claim 1. As Plaintiff notes, read together, Claims 1 and 2 recite that while "substantially no cooling fluid is vaporized within said interior passageway," "at least some of the cooling liquid" is then vaporized in the secondary passageway as the fluid leaves the interior of the heat sink. *See* '901 Patent, Claims 1 and 2; ECF No. 34 at 25. This is consistent with the patent's disclosure of

"promot[ing] internal cooling" of components "by conduction" while also providing for the "cooling of the surface" of components "by evaporative and conductive cooling." '901 Patent at col. 2:31–37.

Notwithstanding the above, the Court agrees Claims 1 and 2 do not provide express guidance as to what quantity of cooling fluid is vaporized within the interior passageway such that "substantially no cooling fluid is vaporized." Instead, the claim language provides only that *some* quantity of liquid must remain in the interior passageway to permit *some* level of vaporization in the secondary passageway.

The Court therefore looks next to the patent specification and file history. *See Berkheimer*, 881 F.3d at 1364. The '901 Patent specification provides that instead of vaporizing near the heat sink, "to achieve maximum efficiency," cooling fluid "should begin to vaporize near the surface of the component or heat sink." '901 Patent, cols. 9:60–63. If the system is operating at its "maximum operating capacity," phase change should occur "at or near the surface of an energized component at full load or at or near the surface of a heat sink that is associated with a component operating at full load." *Id.* at col. 10:17–21. In contrast, if the system is operating "below its peak rating," it performs "conductive cooling i.e., without phase change." *Id.* at col. 10:21–24.

In other words, the specification provides that when the system is operating below its peak rating, cooling is conducted exclusively through conduction without phase change; and even when the system is operating at its maximum capacity, phase change should only occur at or near the surface of the component or heat sink (rather than in internal passageways close to the heat sink). *See id.* at col. 10:17–24. This supports Plaintiff's proposed construction that the "substantially no" term is properly construed as "no or minimal [cooling fluid is lost]; no or minimal [vaporization]."[6]

---

[6]    In this way, Plaintiff's proposed construction contemplates real-world conditions, where some miniscule amount of vaporization may be unavoidable. *See In re Packard*,

The prosecution history provides further support for Plaintiff's proposed construction. During the prosecution of the '901 Patent, the Patent Office issued a non-final office action rejecting Claim 1 of the '901 Patent as being anticipated by U.S. Patent No. 5,491,363 ("Yoshikawa"). ECF Nos. 34 at 25–27; 34-10 at 4. The Patent Office action states the claim was rejected because Yoshikawa also taught "means . . . for supplying cooling fluid capable of phase change to" an interior passageway "to conductively cool the interior of [a] heat sink" and that the cooling liquid would "flow through [] other passageways" in order "to cool" the "exterior surface" of the heat sink "at least partially by evaporative cooling." ECF No. 34-10 at 4. In responding to this rejection, the '901 Patent applicant amended Claim 1 "to require that the rate at which cooling fluid passes through the interior passageway is such that substantially no cooling fluid vaporizes within the interior passageway." ECF No. 34-11 at 7. The applicant concluded the method of Claim 1 was, therefore, not anticipated by Yoshikawa because "at least some of the cooling fluid vaporizes within the Internal Space of Yoshikawa." *Id.* Google's argument that the distinction drawn in the prosecution history creates a "vast middle ground" is unpersuasive. ECF No. 37 at 12–13. Instead, the amendment and accompanying explanation lend support to Plaintiff's position that the "substantially no" limitation excludes configurations where a non-minimal amount of vaporization occurs in the interior passageway.

The Court finally looks to the extrinsic evidence. *See Berkheimer*, 881 F.3d at 1364. Here, Dr. Banerjee opined that a POSITA would have understood the "substantially no" limitation to mean "that no or minimal cooling fluid is lost . . . or no or minimal vaporization . . . within the interior passageway of the heat sink." Banerjee Decl. ¶ 26. In contrast, Dr. King opined that the term is indefinite because a POSITA "would have to

---

751 F.3d 1307, 1313 (Fed. Cir. 2014) (The indefiniteness requirement "is not a demand for unreasonable precision. The requirement, *applied to the real world* of modern technology, does not contemplate in every case a verbal precision of the kind found in mathematics.") (internal quotation marks omitted).

make a separate determination" of what the term means in different environments. King Decl. ¶ 37. Dr. King does not opine, however, that a POSITA would be *unable* to make these determinations. *See* King Decl. Instead, Dr. King opines that the patent disclosure does not contain sufficient information to *enable* a POSITA to make these separate determinations in each of these different environments:

> A [POSITA] would further understand that there are complicated physical links between vapor quantity, flow rate, temperature distribution, heat flux, and other physical parameters in the system. The vapor quantity is typically evaluated using sophisticated mathematical modeling or detailed computer simulations. As such, "substantially" is too vague of a descriptor *to enable the design and operation of the system without additional explanation or technical details.*

*Id.* (emphasis added).

Enablement and indefiniteness are separate inquiries. *See E-Numerate Sols., Inc. v. United States*, 170 Fed. Cl. 147, 154 (2024) ("Claim construction may contain indefiniteness inquiries, but other invalidity arguments under § 112, such as lack of enablement or lack of adequate written description, are separate and distinct."); *see ON24, Inc. v. webinar.net, Inc.*, 698 F. Supp. 3d 1154, 1167 n.7 (N.D. Cal. 2023) ("[I]ndefiniteness and enablement are distinct and different inquiries.").[7] "Even if the written description does not enable the claims, the claim language itself may still be definite." *Union Pac. Res. Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 692 (Fed. Cir. 2001).

---

[7]    "Enablement serves the dual function in the patent system of ensuring adequate disclosure of the claimed invention and of preventing claims broader than the disclosed invention." *MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1380–81 (Fed. Cir. 2012). The doctrine "prevents both inadequate disclosure of an invention and overbroad claiming that might otherwise attempt to cover more than was actually invented." *Id.* at 1381. "Thus, a patentee chooses broad claim language at the peril of losing any claim that cannot be enabled across its full scope of coverage." *Id.*

Here, the Court declines to address Google's enablement arguments (if any) at the claim construction stage. *See Haddad v. United States*, 164 Fed. Cl. 28, 67 (2023) ("[V]alidity arguments, such as lack of enablement and lack of written description, are not proper to address during claim construction."); *ASM Am., Inc. v. Genus, Inc.*, No. C-01-2190-EDL, 2002 WL 1892200, at *16 (N.D. Cal. Aug. 15, 2002) ("Because analysis of enablement focuses on the adequacy of the specification in teaching a person of ordinary skill in the art how to make and use the invention, it cannot be considered to be part of claim construction.").

Google's reliance on the Federal Circuit's *Interval Licensing* decision is also not persuasive. ECF No. 35 at 17. *Interval Licensing* involved a claim related to displaying content "in an unobtrusive manner that does not distract a user." 766 F.3d at 1367. The Court of Appeals held that the term "unobtrusive manner" was a "term of degree" that was "highly subjective and, on its face, provides little guidance to one of skill in the art." *Id.* at 1371. As the Court of Appeals later explained in *Sonix Tech*, *Interval Licensing* involved a term that was "subjective in the sense that [it] turned on a person's tastes or opinion." 844 F.3d at 1378. This was because the term "unobtrusive manner" "implicates a person's individual focus, concentration, attentiveness, or similar mental state at a given moment, or even opinions, affecting what is or is not distracting." *Id.*

Google has not sufficiently explained how the *Interval Licensing* case is analogous to this one. As Google's own expert opined, the question of whether "substantially no cooling fluid is vaporized within said interior passageway" can be measured. *See* King Decl. ¶ 38 ("In principle, the vapor quantity could be monitored using sensing systems."). Unlike in *Interval Licensing*, "[t]his provides an objective baseline through which to interpret the claims." *Sonix Tech*, 844 F.3d at 1378 (holding that whether something is "visually negligible" involved what could be seen by the normal human eye thereby providing an "objective baseline" for interpreting claim language); *see Polaris PowerLED Tech., LLC v. VIZIO, Inc.*, No. SACV1801571JVSDFMX, 2019 WL 13043592, at *17 (C.D. Cal. Nov. 26, 2019) ("The term 'zero' denotes a specific value and the term of degree

'approximately' accounts for slight variations from that specified baseline.").

For these reasons, the Court concludes Google has not demonstrated by clear and convincing evidence that the claim limitation "substantially no cooling fluid is vaporized within said interior passageway" is indefinite. The Court instead finds it appropriate to adopt Plaintiff's alternative construction of this term as: "no or minimal [cooling fluid is lost]; no or minimal [vaporization]."

## IV.    CONCLUSION

The Court construes the disputed terms as follows:

| Limitation | Agreed Construction |
|---|---|
| "means for adjusting the rate at which said cooling fluid passes through said interior passageway so that substantially no cooling fluid is vaporized within said interior passageway" (Claims 1 and 16) | Construed as a means-plus-function term under 35 U.S.C. § 112, ¶ 6<br><br>Function: "adjusting the rate at which said cooling fluid passes through said interior passageway [so that substantially no cooling fluid is vaporized within said interior passageway]";<br><br>Structure: "pump, or the evaporator side of a heat pipe and a reservoir of cooling fluid having a heat differential between them." |
| "substantially no cooling fluid is vaporized within said interior passageway" (Claims 1 and 16) | "no or minimal [cooling fluid is lost]; no or minimal [vaporization]" |

**IT IS SO ORDERED.**

Dated: August 18, 2025

Hon. Robert S. Huie
United States District Judge